IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL NO. 3:01 CV 1568 (SRU) |
| | ) | |
| RALPH BELLO, et. al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DETROIT STEEL CORPORATION, et. al., | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF UNITED
STATES' MOTION TO ENTER CONSENT DECREE**

Plaintiff, the United States of America, respectfully submits this Memorandum in

Support of its Motion to Enter the Consent Decree, which was lodged with this Court on May

26, 2004.  The proposed Consent Decree ("Consent Decree" or "Settlement") resolves Plaintiff's

claims against defendants Ralph Bello, Vera Bello, Vera Associates Limited Partnership, and the

real property addressed at 16-20 Elm Street, West Haven, Connecticut ("Settling Defendants")

under the Comprehensive Environmental Response, Compensation, and Liability Act

("CERCLA"), 42 U.S.C. §§ 9601 et seq., with respect to the National Oil Services Superfund

Site ("Site") in West Haven, Connecticut.

The Consent Decree requires the Settling Defendants to pay $150,000 of the

unreimbursed removal costs incurred by the United States Environmental Protection Agency

("EPA") related to the Site.  This amount is in addition to the approximately $1.1 million

recovered under two prior consent decrees with over 400 large volume contributors of hazardous substances at the Site. The United States has also recently reached an agreement in principle with certain third party defendants and The Torrington Company pursuant to which those settling defendants will collectively reimburse the United States an additional $385,000 (once consummated by all the settling parties and if approved by this Court). Together, these proposed settlements recover approximately $1.64 million–about 92%–of the approximate total of $1.77 million in costs EPA incurred related to the cleanup of the Site.[1]

On June 4, 2004, the United States published notice of the proposed Consent Decree in the Federal Register and initiated a 30-day public comment period. 69 Fed. Reg. 31638 (June 4, 2004).[2] The comment period has concluded, and no comments were received.

However, since signing the proposed Consent Decree, Settling Defendant Ralph Bello ("Mr. Bello") has sent numerous letters to a variety of governmental agencies, and high level government officials, complaining about the government's handling of this matter. He requests the return of his settlement payment and/or that the lien be removed from the Site immediately. Copies his letters that were sent to the Department of Justice (shortly before or) after Mr. Bello signed the Decree are attached as Exhibit A. None of these letters were sent to this Court, and none of these letters explicitly seek to withdraw from the Decree. Further, none of the other Settling Defendants have sought to set aside the agreement, and neither have any of Mr. Bello's family members, some of whom were directly involved in facilitating the Consent Decree.

_____

[1] This figure does not include $123,441 in prejudgment interest as of March 11, 2004.

[2] At the request of The Torrington Company, the comment period was extended until July 9, 2004. The Torrington Company declined to submit any comments on the Consent Decree.

These highly unusual circumstances are brought to the Court's attention only to ensure complete candor by the government to this Court. As explained in more detail below (pages 13-16), the United States does not believe the letters from Mr. Bello justify rejection of the proposed Decree.

Accordingly, the United States respectfully requests that the Court enter the Consent Decree because it is fair, reasonable, and consistent with the goals of CERCLA. As explained in more detail below, the settlement represents a fair compromise with the Settling Defendants who are paying $150,000 to resolve their liability for the Site despite consistently maintaining that they are entitled to an "innocent landowner" defense, and that EPA damaged their property in the process of addressing Site contamination. Although the United States believes it would prevail at trial, the compromise is warranted to avoid lengthy litigation and promptly reimburse the Superfund. Therefore, the United States respectfully requests that this Court sign and enter the Decree and sign the proposed Order attached to the Motion approving and entering the Decree as a final judgment pursuant to Federal Rule of Civil Procedure 54(b).

## I.    FACTUAL BACKGROUND

### A.    Site History

The Site is situated on Elm Street in West Haven, Connecticut, near the shore of the West River adjoining New Haven Harbor and Long Island Sound. From 1982 to 1997, National Oil Services, Inc. ("National Oil" or "the Company") leased the Site and operated a waste oil storage, treatment, transfer, recycling, and disposal facility there. Since 1982, defendants Ralph Bello, Vera Bello, and/or Vera Associates Limited Partnership have owned the Site.

National Oil was evicted from the Site in 1997. The Company abandoned a number of

3

above ground storage tanks ("ASTs") and drums containing oil, wastewater, and sludge contaminated with hazardous substances at the Site.

In December 1997, EPA investigated conditions at the Site because of a concern that pipes connecting the ASTs could freeze and rupture, causing a release of contaminated oil into New Haven Harbor and Long Island Sound. As a result, EPA commenced a removal action in 1998 pursuant to Section 104(a) of CERCLA, 42 U.S.C. § 9604(a).

The removal action primarily consisted of emptying and cleaning the storage tanks. The contents of the tanks–approximately 105,000 gallons of contaminated waste oil; approximately 140,000 gallons of contaminated wastewater; and approximately 930,000 pounds of sludge–were disposed of offsite. EPA has incurred costs of approximately $1.77 million at the Site, not including $124,441 in prejudgment interest.

B.    The Consent Decree

The Consent Decree requires the Settling Defendants to pay $150,000 to reimburse EPA for its response costs at the Site. Pursuant to the Consent Decree, the payment has been deposited in an interest bearing account pending court approval of the settlement. In the unlikely event that the settlement is rejected by the Court, the money, plus interest, will be returned to the Settling Defendants.

The proposed Consent Decree is modeled after the two prior settlements that were previously entered and approved in connection with this Site.[3] Accordingly, the covenants and protections afforded by the three settlements are virtually identical.

_____

[3] In United States v. A-1 Auto, Civ. Action No. 3:01CV1567, the consent decree was entered on December 17, 2002. In United States v. Franc Motors, 3:02CV0071, the consent decree was entered on September 19, 2002.

4

II. ARGUMENT

A.    Standard of Review

Approval of a consent decree is a judicial act committed to the informed discretion of the

trial court. United States v. Hooker Chem. & Plastics Corp., 776 F.2d 410, 411 (2d Cir. 1985).

Generally, when reviewing a settlement the standard to be applied is whether the settlement is

"fair, adequate, and reasonable." Walsh v. Great Atlantic & Pacific Tea Co., 726 F.2d 956, 965

(3d Cir. 1983).[4] This standard has been affirmed for the review of CERCLA settlements. See,

e.g., United States v. Cannons Eng'g Corp., 899 F.2d 79, 85 (1st Cir. 1990)(court should enter a

CERCLA consent decree if the decree "is reasonable, fair, and consistent with the purposes that

CERCLA is intended to serve")(quoting the House Report on the Superfund Amendments and

Reauthorization Act of 1986, H.R. Rep. No. 99-253, Part 3 at 19 (1985), reprinted in 1986

U.S.C.C.A.N. 3038, 3042).[5]

Judicial review of a settlement negotiated by the United States is subject to special

deference. According to the First Circuit in Cannons, courts should not engage in "second-

guessing the Executive Branch" when evaluating settlement agreements negotiated by the United

States. 899 F.2d at 84.[6] This standard applies equally with respect to consent decrees reached

---

[4] See also Conservation Law Found. of New England, Inc. v. Franklin, 989 F.2d 54, 58 (1st Cir. 1993)(court reviews decree to ensure that it is "fair, adequate, reasonable; that the proposed decree will not violate the Constitution, a statute, or other authority; [and] that it is consistent with the objectives of Congress")(quoting Durrett v. Housing Auth. of Providence, 896 F.2d 600, 604 (1st Cir. 1990)).

[5] See also United States v. DiBiase, 45 F.3d 541, 543 (1st Cir. 1995); United States v. Charles George Trucking, Inc., 34 F.3d 1081, 1084-85 (1st Cir. 1994).

[6] See generally Sam Fox Publ'g Co. v. United States, 366 U.S. 683, 689 (1961)(Absent malfeasance or bad faith, courts are not to "assess the wisdom of the Government's judgment in

under CERCLA. See United States v. Davis, 261 F.3d 1, 21 (1st Cir. 2001)("Considerable deference is involved in the review of CERCLA consent decrees.").[7] And the reviewing court may approve or reject the proposed Consent Decree, but the court does not have the authority to modify the proposed Decree. Cannons, 720 F.Supp. at 1036.

    B. The Consent Decree Should Be Approved By the Court.

As discussed below, the Consent Decree meets the prescribed standard of fairness, reasonableness, and consistency with CERCLA, and it should be entered by this Court.

    1. The Consent Decree is Fair.

The first element courts consider when reviewing a consent decree is whether the settlement is fair. Fairness of a CERCLA settlement involves both procedural fairness and substantive fairness. Davis, 261 F.3d at 23; United States v. Cannons Eng'g Corp., 720 F. Supp. 1027, 1039 (D. Mass. 1988), aff'd, 899 F.2d 79 (1st Cir. 1990).

Courts evaluate procedural fairness by considering the openness and candor of the bargaining process. Davis, 261 F.3d at 23. In Rohm & Haas, the court found that

---

negotiating and accepting . . . [a] consent decree."); Conservation Law Found., 989 F.2d at 58 (The "district court must exercise some deference to the agency's determination that settlement is appropriate.")(quoting Federal Trade Comm'n v. Standard Fin. Mgmt. Corp., 830 F.2d 404, 408 (1st Cir. 1987)).

[7] See also Cannons, 899 F.2d at 84 ("The relevant standard, after all, is not whether the settlement is one which the court itself might have fashioned, or considers as ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives of the governing statute."); United States v. Rohm & Haas Co., 721 F. Supp. 666, 685 (D.N.J. 1989)("If a settlement were required to meet some judicially imposed platonic ideal, then, of course, the settlement would constitute not a compromise by the parties but judicial fiat. Respect for litigants, especially the United States, requires the court to play a much more constrained role."); Charles George, 34 F.3d at 1085 (Courts "must defer heavily to the parties' agreement and the EPA's expertise.").

where a settlement is the product of informed, arms-length bargaining by the
EPA, an agency with the technical expertise and the statutory mandate to enforce
the nation's environmental protection laws, in conjunction with the Department of
Justice . . . a presumption of validity attaches to that agreement.

721 F. Supp. at 681 (citing City of New York v. Exxon Corp., 697 F. Supp. 677, 692 (S.D.N.Y.

1988))(emphasis added).[8]

Here, the Consent Decree is procedurally fair. During the course of the settlement

process, Plaintiff and the Settling Defendants had adverse interests, and the real property

addressed at 16-20 Elm Street, West Haven, Connecticut ("the In Rem Property") and Vera

Limited Partnership were represented by counsel. Ralph and Vera Bello were initially

represented by counsel, until their lawyer sought and was given permission to withdraw.[9]

Although Mr. and Mrs. Bello had ample opportunity to retain new counsel, they declined to do

so.

On or about February 5, 2004, Don Bello attended a status conference before this Court

with his brother Gary Bello, and their father Ralph Bello. Since that conference, Don Bello had

many discussions with counsel for the United States Department of Justice and EPA regarding

this matter and the possibility of resolving it without further resort to litigation. Don Bello

facilitated the overall process of reaching an agreement in principle with the Settling Defendants.

Ultimately, Vera and Ralph Bello, as pro se defendants, elected to sign the proposed Settlement

on their own behalf. Attorney Peter K. Manko signed the proposed Consent Decree on behalf of

his clients, Vera Associates Limited Partnership and the In Rem Property.

---

[8] See also DiBiase, 45 F.3d at 544-46; Charles George, 34 F.3d at 1089.

[9] Order signed December 17, 2003, and entered December 23, 2003.

7

Here the process of negotiating the Decree took months, if not years. Over the years, Mr. Bello has written many letters to the United States advocating his views. See Exhibit B which represents a sample of such letters (a complete set is available upon request, but represents approximately a one foot stack of documents). And Mr. Bello has also received repeated explanations from the United States (in person, over the phone, and in writing) of the law and facts governing this Site in an effort to inform him of the reasons that the United States disagrees with his representations. A sample of some of these letters is also attached as Exhibit C. The parties' interests were adverse and only after a period of contested negotiations was a compromise ultimately reached. Accordingly, the process of achieving the settlement satisfies the criterion of procedural fairness.

The second element of the fairness inquiry is substantive fairness. As the First Circuit stated in Cannons: "Substantive fairness introduces into the equation concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible." 899 F.2d at 87. As the court explained: "The logic behind these concepts dictates that settlement terms must be based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm each [potentially responsible party] has done." Id. at 87.[19] Furthermore, "[a] finding of procedural fairness may also be an acceptable proxy for substantive fairness, when other circumstantial indicia of fairness are present." Davis, 261 F.3d at 23.

As discussed above, under the Decree the Settling Defendants will pay $150,000 to

---

[19] See also Charles George, 34 F.3d at 1087-89.

reimburse the government for its response costs incurred at the Site.   The Settling Defendants

have consistently maintained that they are entitled to an "innocent landowner" and/or "third

party" defense under Section 107(b) of CERCLA because Mr. Bello allegedly tried to evict his

tenant, requested the State's assistance in bringing National Oil into compliance with

environmental laws, and none were personally involved in the day to day operations of National

Oil.   The Settling Defendants further argue they are not responsible directly or indirectly for any

of the hazardous substances found at the Site, and that EPA damaged their above ground storage

tanks by cutting holes in the tanks.  In addition, Mr. Bello has sent many letters to the United

States Department of Justice over the past several years regarding this matter, accusing the

government of corruption, mishandling funds, treating him unfairly, being dishonest, and even of

causing his recent heart attack and other health problems.  See Exhibit B.

        While the United States believes it would ultimately prevail at trial, the $150,000

settlement offer on behalf of the Settling Defendants represents a fair compromise of what would

certainly have been a bitterly contested trial. While Mr. Bello may have been directly responsible

for disposal of hazardous substances at the Site during the early 1980s (which he vehemently

denies), even if proved, these actions are far less culpable than those by National Oil at the Site

from 1982-1997.  Although Mr. Bello leased the Site to National Oil, he was not the direct

operator of National Oil or the Site for any significant period of time.  In terms of litigating the

case, the government wishes to avoid the possibility of a complicated trial involving an

extremely litigious elderly  pro se defendant in poor health.  At the same time, it is also

appropriate that Mr. Bello bear some responsibility for the contamination on his property and the

government's cleanup costs.  Resolving this matter for $150,000 is a fair compromise for all.

2.    The Settlement Is Reasonable.

Three elements are significant to the determination that a CERCLA settlement is reasonable: "the effectiveness of the decree as a vehicle for cleaning the environment; providing satisfactory public compensation for actual (and anticipated) costs of remediation; and accounting for the relative strength of the parties' litigating positions and foreseeable risks of loss." Davis, 261 F.3d at 26.[1]

The first element is not applicable here because EPA performed the clean up on its own initiative before negotiations began with the responsible parties to resolve their liability for the contamination. Accordingly, only the second two elements are relevant to the inquiry of whether the Consent Decree is reasonable in this case.

The second factor used to evaluate the reasonableness of a consent decree—whether the public is adequately compensated—is easily satisfied by the Settlement. EPA's total removal costs related to the Site were approximately $1.7 million, not including interest. Under CERCLA, a defendant is potentially joint and severally liable for the entire amount. However, it is well-settled that "[d]iscounts on maximum potential liability as an incentive to settle are considered fair and reasonable under Congress's [CERCLA] statutory scheme." Davis, 261 F.3d at 26. Upon entry of the Consent Decree, the Settling Defendants will collectively pay $150,000 in CERCLA removal costs. Recovery of this amount combined with the additional sum of about $1.48 million collected (or to be collected) under additional settlement agreements means that EPA will be reimbursed for approximately 90% of its removal costs.[2] Therefore, the United

---

[1] See also Cannons, 899 F.2d at 89-90.

[2] See footnote one above.

10

States submits that the Settlement is reasonable because it adequately compensates the public for the clean up of the Site.

The final component of reasonableness is an evaluation of the relative strength of the parties' litigating positions. See Davis, 261 F.3d at 26 ("It is appropriate 'to factor into the equation any reasonable discounts for litigation risks, time savings, and the like that may be justified.'") (quoting Charles George, 34 F.3d at 1087).[13] A review of this element reinforces the reasonableness of the Decree. If forced to litigate the liability issues resolved in the Decree, the United States believes it would prevail. Nonetheless, prosecuting an action against the Defendants certainly would have delayed the recovery of EPA's removal costs and would have forced the Government to incur significant enforcement costs in the process. When compared to the relatively low cost of the cleanup and the relatively small percentage of fault attributable to the individual Settling Defendants, such time and expense would not have been justified.

Accordingly, the proposed Consent Decree is clearly reasonable. The comprehensive and expeditious recovery of costs adequately compensates the public, and the Settlement reflects the relative strengths of the parties' litigation positions.

3.    The Settlement Is Consistent With CERCLA's Goals And In The Public Interest.

The final criterion for entering the proposed settlement, consistency with CERCLA's goals and the public interest, is easily met. The overarching goals of CERCLA include

---

[13] See also In re Acushnet River & New Bedford Harbor, 712 F. Supp. 1019, 1036 (D. Mass. 1989) ("An interpretation of [CERCLA] more in keeping with the intent of, as well as the language employed by, Congress is one that requires the United States to assess the strengths and weaknesses of its case and drive the hardest bargain that it can.").

accountability, desirability of an unsullied environment, and prompt response activities. See

Davis, 261 F.3d at 26 ("The purposes of CERCLA include expeditious remediation at waste

sites, adequate compensation to the public fisc and the imposition of accountability.")[14] Other

important purposes of CERCLA are to promote finality and reduce transaction costs. See 42

U.S.C. § 9622(a).[15]    Here, the Decree enables expeditious and substantial recovery of the costs

EPA incurred in abating the threat to human health and the environment created by the

hazardous substances stored, and disposed of, at the Site. By resolving the claims against the

Settling Defendants, the United States utilized the most rational, cost-effective means of

recouping the costs of the clean up while holding the Settling Defendants accountable for the

clean up of waste on the Site they own.

      Furthermore, there is a "clear policy in favor of encouraging settlements . . . particularly

in an area where voluntary compliance by the parties . . . will contribute significantly toward

ultimate achievement of statutory goals." Patterson v. Newspaper & Mail Deliverers' Union,

514 F.2d 767, 771 (2d Cir. 1975).[16] This public policy favoring the resolution of litigation by

settlement is particularly strong in the enforcement of environmental statutes. Thus, the policy

favoring settlement "is particularly strong where a consent decree has been negotiated by the

Department of Justice on behalf of [EPA]." Cannons, 720 F. Supp. at 1035.[17]

---

[14] See also Charles George, 34 F. 3d at 1086.

[15] See also Cannons, 899 F.2d at 90; United States v. Hooker Chem., 540 F. Supp. 1067, 1072 (W.D.N.Y. 1982), aff'd, 749 F.2d 968 (2d Cir. 1984); Rohm & Haas, 721 F. Supp. at 696.

[16] See also City of New York v. Exxon Corp., 697 F. Supp. 677, 692 (S.D.N.Y. 1988).

[17] See also United States v. Vertac Chem. Corp., 756 F. Supp. 1215, 1218 (E.D. Ark. 1991), aff'd, sub nom. United States v. Hercules, Inc., 961 F.2d 796 (8th Cir. 1992) (court entered

In addition, the settlement of environmental cases is in the public interest because it effectuates basic policy goals of the statutes. As stated above, in this case the Government will obtain prompt reimbursement of clean up costs associated with the Site while being spared significant litigation and enforcement costs. Meanwhile, the Settling Defendants – who leased their property to National Oil which contributed to the contamination of the Site – are held accountable under the Decree. Therefore, the final criterion to support entry of the Decree is satisfied.

4.  Letters From Mr. Bello Do Not Warrant Rejection of the Decree.

Even after signing the Decree, Mr. Bello continues to send letters to the Department of Justice, and other governmental agencies, complaining about the government's treatment of him, requesting the return of the settlement money, and asking for the removal of the lien on the Site. See Exhibit A.[18]  As explained in more detail below, Mr. Bello's letters do not warrant governmental withdrawal from the Decree, nor do they provide sufficient grounds to reject the

---

CERCLA/RCRA settlement quoting Cannons); Citizens for a Better Env't v. Gorsuch, 718 F.2d 1117, 1126 (D.C. Cir. 1983) (environmental settlement that saved time and money was highly favored); United States v. Bliss, 133 F.R.D. 559, 567 (E.D. Mo. 1990) (court recognized public policy favoring settlements under CERCLA).

[18]     As noted above, Mr. Bello has sent the United States many letters over the years regarding his dissatisfaction with the government's handling of this Site by many individuals and agencies. Over the years, the United States has made every effort to respond to his letters and offer him a complete and documented explanation of the facts and law as it pertains to the Site.
Following Mr. Bello's non-fatal heart attack in the fall of 2003, Mr. Bello's sons, Don and Gary Bello, initiated settlement discussions with EPA and the Department of Justice. Their involvement in settlement discussions lead to the Consent Decree, which was ultimately signed by Ralph Bello.  Nonetheless, Mr. Bello has continued to send letters, now asking for the return of the $150,000, which was deposited in an interest bearing court escrow account pending a decision from the court on whether to enter the Decree.  Mr. Bello would like the lien removed from his property, even though the Consent Decree remains subject to the Court's approval, and the United States has explained that this will happen after the Court enters the Decree.

Decree.

First, Mr. Bello signed the Decree. Once a settling defendant signs the Consent Decree, he agrees in the Consent Decree that he cannot withdraw from the settlement or comment upon it. The provisions of the Consent Decree specifically provide:

> 23. ... Settling Defendants consent to the entry of this Consent Decree without further notice. . . .
>
> 27. Each Settling Defendant hereby agrees not to oppose entry of this Consent Decree by this Court or to challenge any provision of this Consent Decree, unless the United States has notified Settling Defendants in writing that it no longer supports entry of the Consent Decree [which it has not done here].

Under the terms of the Settlement, signed by Mr. Bello, he agreed not to challenge the settlement by sending letters opposing the terms of the Decree. In short, his letters should not be a basis for rejecting the Decree.

Second, there is no question that Mr. Bello signed the Consent Decree on his own behalf, and that, at least, he is contractually bound by his signature. The Consent Decree that he signed explicitly states he is bound by the agreement:

> 26. The undersigned representatives of the Settling Defendants and ... each certifies that he or she is authorized to enter into the terms and conditions of this Consent Decree and to execute and bind legally such Party to this document.

Thus, there is no doubt that Mr. Bello is legally bound to the provisions of the Decree and Mr. Bello does not assert that he lacked authority to sign the Consent Decree.

Third, it is not clear that Mr. Bello desires the Court be aware of his concerns. He may have hoped that EPA would remove the lien sooner as a result of his letters, but not wanted the Court to reject the settlement. After all, he sent copies of his letters to numerous governmental entities, agencies, and high level governmental figures, including Vice President Richard

14

Cheney, and Attorney General John Ashcroft. But, he has not sent letters to this Court, even

though he has appeared before this Court, and already sent at least one letter to the Court. See

Exhibit D. Clearly, if he wished the Court to be aware of his concerns regarding the proposed

Decree, he could have sent a copy of his letters to the Court.

Fourth, none of the criteria for permitting a party to withdraw from an executed contract

are present here.[19] There is no evidence of mental incompetence in signing the Decree;[20] no

evidence of fraud by the government;[21] and no evidence of the government forcing Mr. Bello to

sign the Consent Decree under duress.[22] Accordingly, Mr. Bello is bound to the terms of the

---

[19] A consent decree is principally an agreement between parties and as such should be construed like a contract. Crumpton v. Bridgeport Educ. Ass'n, 993 F.2d 1023, 1028 (2d Cir. 1993); SEC v. Levine, 881 F.2d 1165, 1178 (2d Cir. 1989) (Traditional contract principles apply to the decree). Here, the contract is governed according to the law of the state (Connecticut) where the contract was made. Cudahy Packing Co. v. Narzisenfeld, 3 F.2d 567, 569-570 (2nd Cir. 1924).

[20] Under Connecticut law, the test of a person's mental capacity to enter a contract is whether at the time of the transaction he possessed understanding sufficient to enable him to comprehend the nature, extent and consequence of the transaction. Twitchell v. Guite, 53 Conn. App. 42, 50, 728 A.2d 1121, 1126 (1999)(citing Nichols v. Nichols, 79 Conn. 644, 657, 66 A.161, 165 (1907)). Even contracts made by an incapable person during lucid intervals are valid. Wendland v. Santiago, No. 09 21 10 1991 WL 27347 at *3 (Conn. Super. Ct. Jan. 8, 1991). There is a presumption of sanity in the performance of legal acts and the defendant bears the burden of rebutting that presumption. Id. Here Mr. Bello appears perfectly capable of comprehending the nature, extent and consequence of the Consent Decree.

[21] "Absent fraud or mental incompetence, a person who intentionally signs a document is bound by its contents." Am. Fence Co., Inc. v. MRM Sec. Sys., Inc., 710 F.Supp. 37, 41 (D. Conn. 1989) (citation omited). A fraud claim requires that there be a "false representation made as a statement of fact." Weisman v. Kaspar, 233 Conn. 531, 539, 661 A.2d 530, 533 (1995). Mr. Bello is a landowner of a contaminated site. His potential liability under CERCLA is certain. Accordingly, there is no misrepresentation or fraud in the government's settlement negotiations with Mr. Bello.

[22] To establish duress, Mr. Bello must prove that a wrongful act or threat was directed at him. Weisman, 233 Conn. at 549 n.15, 661 A.2d at 538 n.15 (citing Restatement (Second) of Contracts §§ 175, 176 (1981)). Although the government has filed a lawsuit against Mr. Bello

contract he signed.

In short, the United States Department of Justice notifies the Court of Mr. Bello's recent letters in the spirit of candor to the Court. In the end, the best method of addressing Mr. Bello's concerns about the removal of the lien on his property is to enter the Decree. Upon entry of the Decree, the United States will expeditiously remove the lien from the Site. Accordingly, the United States respectfully requests that this Court promptly enter the proposed Consent Decree.

### C. The Decree Should Be Entered As A Final Judgment Because There Is No Just Reason For Delay

The United States moves that the Decree be signed by the Court and entered as a final judgment pursuant to Fed. R. Civ. P. 54(b) and 58. See Decree, ¶ 29. There are three requirements for entry of a final judgment pursuant to Rule 54. First, the court must determine that the matter is a final judgment within the meaning of 28 U.S.C. § 1291. Next, the court must determine that there is no "just reason" for delay. Finally, the court must identify the factors it relied upon in making its decision. Consolidated Rail Corp. v. Fore River Ry. Co., 861 F.2d 322, 325 (1st Cir. 1988).

The standards for Rule 54 are met in this case. First, the Consent Decree constitutes a final judgment because it resolves "all liability of settling defendant[] on 'cognizable claim[s] for relief' brought by plaintiffs under CERCLA." United States v. Cannons Eng'g. Corp., 720 F.Supp. at 1053 (quoting Curtiss-Wright Corp. v. General Electric Co., 446 U.S. 1, 7 (1980). Thus, the Decree is a final judgment because it constitutes an ultimate disposition of the claims of the governments as to the Settling Defendants. Id., (quoting Sears, Roebuck & Co. v.

---

under CERCLA, the Department of Justice's pursuit of a statutory mandate cannot be deemed a wrongful threat or act.

contract he signed.

In short, the United States Department of Justice notifies the Court of Mr. Bello's recent letters in the spirit of candor to the Court. In the end, the best method of addressing Mr. Bello's concerns about the removal of the lien on his property is to enter the Decree. Upon entry of the Decree, the United States will expeditiously remove the lien from the Site. Accordingly, the United States respectfully requests that this Court promptly enter the proposed Consent Decree.

### C. The Decree Should Be Entered As A Final Judgment Because There Is No Just Reason For Delay

The United States moves that the Decree be signed by the Court and entered as a final judgment pursuant to Fed. R. Civ. P. 54(b) and 58. See Decree, ¶ 29. There are three requirements for entry of a final judgment pursuant to Rule 54. First, the court must determine that the matter is a final judgment within the meaning of 28 U.S.C. § 1291. Next, the court must determine that there is no "just reason" for delay. Finally, the court must identify the factors it relied upon in making its decision. Consolidated Rail Corp. v. Fore River Ry. Co., 861 F.2d 322, 325 (1st Cir. 1988).

The standards for Rule 54 are met in this case. First, the Consent Decree constitutes a final judgment because it resolves "all liability of settling defendant[] on 'cognizable claim[s] for relief' brought by plaintiffs under CERCLA." United States v. Cannons Eng'g. Corp., 720 F.Supp. at 1053 (quoting Curtiss-Wright Corp. v. General Electric Co., 446 U.S. 1, 7 (1980). Thus, the Decree is a final judgment because it constitutes an ultimate disposition of the claims of the governments as to the Settling Defendants. Id., (quoting Sears, Roebuck & Co. v.

---

under CERCLA, the Department of Justice's pursuit of a statutory mandate cannot be deemed a wrongful threat or act.

16

Mackey, 351 U.S. 427, 436 (1956)). See also, Consolidated Rail v. Fore River, 861 F.2d at 325 (judgment is final where it "leaves nothing for the Court to do but execute the judgment" citing Catlin v. United States, 324 U.S. 229, 233 (1945)).

Second, there is no just reason for delay. The United States has a lien on the Site, which can only be removed upon entry of the settlement. The Settling Defendants request that the lien be removed as soon as possible, and there is no reason to delay doing so. In addition, a final judgment "will advance the interests of judicial administration and public policy" and promote the statutory goal of providing the Settling Defendants with finality. Id.

Therefore, the standards for entry of a final judgment pursuant to Rule 54(b) have been met. This Court should not only approve and sign the Consent Decree, but also should enter it as a final judgment and identify the bases for its decision in accordance with Rules 54 and 58.

## IV.  CONCLUSION

The Consent Decree executed by the United States and the Settling Defendants is a fair and reasonable resolution of claims against the Settling Defendants, comports with the objectives of CERCLA, and is in the public interest. There have been no public comments on the Decree, and no other showing that entry of the Decree is improper, inadequate or not in the public interest. The Court should defer to the agreements reached in the Decree, and enter the Decree

17

as a final judgment.

Respectfully Submitted,

THOMAS L. SANSONETTI
Assistant Attorney General
Environment and Natural Resources Division


_____ /s/ C. A. Fiske
CATHERINE ADAMS FISKE
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
One Gateway Center -- Suite 616
Newton, MA 02458
(617) 450-0444 (phone)
(617) 450-0448 (fax)




KEVIN J. O'CONNER
United States Attorney
District of Connecticut

JOHN B. HUGHES
Assistant United States Attorney
U.S. Attorney's Office
District of Connecticut
Connecticut Financial Center
157 Church Street
New Haven, Connecticut  06510


OF COUNSEL:

STEVEN SCHLANG
Senior Enforcement Counsel
U.S. Environmental Protection Agency
Region I
One Congress Street, Suite 1100
Boston, MA  02114-2023

18

<u>Certificate of Service</u>

     I hereby certify that the foregoing document was served this 15th day of July, 2004, by first class upon counsel of record in this matter and upon Ralph and Vera Bello.


                          /s/ C. A. Fiske
                          Catherine Adams Fiske

19