IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

FILED

2005 MAY -3 A 9:40

U.S. DISTRICT COURT
BRIDGEPORT, CONN

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL NO. 3:01 CV 1568 (SRU) |
| ) | |
| RALPH BELLO, et. al., ) | |
| ) | |
| Defendants, ) | |
| ) | |
| v. ) | |
| ) | |
| DETROIT STEEL CORPORATION, et. al., ) | |
| ) | |
| Third-Party Defendants. ) | |

## MEMORANDUM IN SUPPORT OF UNITED
## STATES' MOTION TO ENTER CONSENT DECREE

Plaintiff, the United States of America, respectfully submits this Memorandum in Support of its Motion to Enter the Consent Decree, which was lodged with this Court on February 9, 2005. The proposed Consent Decree ("Consent Decree" or "Settlement") resolves Plaintiff's claims against defendant The Torrington Company ("Torrington" or the "Settling Defendant") under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*, with respect to the National Oil Services Superfund Site ("Site") in West Haven, Connecticut.

The Consent Decree requires the Settling Defendant to pay $350,000 of the unreimbursed removal costs incurred by the United States Environmental Protection Agency ("EPA") related to the Site. This amount is in addition to the approximately $1.285 million recovered through four previously approved consent decrees, including two settlements with over 400 generators, a

settlement with certain third party defendants, and a settlement with the Site owners including Mr. Ralph Bello ("Mr. Bello"). Together, these proposed settlements recover approximately $1.64 million – about 92% – of the approximate total of $1.77 million in costs EPA incurred related to the clean-up of the Site.[1]

On February 17, 2005, the United States published notice of the proposed Consent Decree in the Federal Register and initiated a 30-day public comment period. 70 Fed. Reg. 8110 (Feb. 17, 2005). The comment period has concluded, and the only comments received were from Mr. Bello.[2]

Since lodging the proposed Consent Decree, Mr. Bello has sent numerous letters to this Court. See copies of letters dated after the lodging of the Consent Decree attached hereto as Exhibit 1. Copies were also provided by Mr. Bello to a variety of governmental agencies and high level government officials. Id. These letters are generally critical of the government's treatment of this case, but also contain a few specific objections to the government's settlement with Torrington. Id.

As this Court is aware, the United States resolved its claims against Mr. Bello in a consent decree that was entered by this Court on August 19, 2004. Subsequently, Mr. Bello declined to participate in a hearing scheduled in this matter, and notified this Court, by letter of November 5, 2004, that he "withdr[ew] [his] request for a hearing." See copy of letter attached hereto as Exhibit 2. He further indicated that he would "totally divorce" himself from any

---

[1] This figure does not include $123,441 in prejudgment interest as of March 11, 2004.

[2] Although Mr. Bello's letters were not specifically transmitted to the United States as comments to the proposed Decree, the United States is treating the letters as if they were comments to provide Mr. Bello with yet another opportunity to be heard.

2

further disputes with EPA, and that he did so of his own free will and choice. Id.

However, since signing his settlement with the government, and since signing his letter committing to "totally divorce" himself from further disputes with EPA, Mr. Bello has continued to send letters to the Court, and other governmental officials. Mr. Bello requests the return of his settlement payment, and complains that the government is not recovering enough money from Torrington. See Exhibit 1.[3] As explained in more detail below (pages 6-9), the United States does not believe the letters from Mr. Bello justify rejection of the proposed Decree with Torrington.

The Decree represents a fair compromise with Torrington to resolve its liabilities at the Site. Torrington is paying $350,000, which is more than any other single defendant. Yet, Torrington has consistently maintained that none of its wastes were present at the Site when EPA emptied the above ground storage tanks. Although the United States believes it would prevail at trial, the compromise is warranted to avoid lengthy litigation and promptly reimburse the Superfund. Because the proposed Consent Decree is fair, reasonable, and consistent with the goals of CERCLA, the United States respectfully requests that this Court sign and enter the Decree and sign the proposed Order attached to the Motion approving and entering the Decree as a final judgment pursuant to Federal Rule of Civil Procedure 58. With entry of this final settlement, this long-standing matter may be closed.

I. FACTUAL BACKGROUND

A. Site History

The Site is situated on Elm Street in West Haven, Connecticut, near the shore of the West

---

[3] EPA's response to these comments from Mr. Bello are attached hereto as Exhibit 3.

3

River adjoining New Haven Harbor and Long Island Sound. From 1982 to 1997, National Oil Services, Inc. ("National Oil" or "the Company") leased the Site and operated a waste oil storage, treatment, transfer, recycling, and disposal facility there. Since 1982, defendants Mr. Bello, Vera Bello, and/or Vera Associates Limited Partnership have owned the Site.

National Oil was evicted from the Site in 1997. The Company abandoned a number of above ground storage tanks ("ASTs") and drums containing oil, wastewater, and sludge contaminated with hazardous substances at the Site.

In December 1997, EPA investigated conditions at the Site because of a concern that pipes connecting the ASTs could freeze and rupture, causing a release of contaminated oil into New Haven Harbor and Long Island Sound. As a result, EPA commenced a removal action in 1998 pursuant to Section 104(a) of CERCLA, 42 U.S.C. § 9604(a).

The removal action primarily consisted of emptying and cleaning the storage tanks. The contents of the tanks – approximately 105,000 gallons of contaminated waste oil; approximately 140,000 gallons of contaminated wastewater; and approximately 930,000 pounds of sludge – were disposed of offsite. Over the course of several years, Torrington sent approximately 3,896,655 gallons of contaminated waste oil to the Site, some of which had been removed from the tanks by the time of EPA's clean-up. EPA has incurred costs of approximately $1.77 million at the Site, not including $123,441 in prejudgment interest.

B. The Consent Decree

The Consent Decree requires Torrington to pay $350,000 to reimburse EPA for its response costs at the Site. The proposed Consent Decree is modeled after the three prior

4

settlements with defendants that sent waste to the Site.[4] Accordingly, the covenants and protections afforded by the three settlements are virtually identical.

## II. ARGUMENT

A. Standard of Review

Approval of a consent decree is a judicial act committed to the informed discretion of the trial court. United States v. Hooker Chem. & Plastics Corp., 776 F.2d 410, 411 (2d Cir. 1985). Generally, when reviewing a settlement the standard to be applied is whether the settlement is "fair, adequate, and reasonable." Walsh v. Great Atlantic & Pacific Tea Co., 726 F.2d 956, 965 (3d Cir. 1983).[5] This standard has been affirmed for the review of CERCLA settlements. See, e.g., United States v. Cannons Eng'g Corp., 899 F.2d 79, 85 (1st Cir. 1990)(court should enter a CERCLA consent decree if the decree "is reasonable, fair, and consistent with the purposes that CERCLA is intended to serve")(quoting the House Report on the Superfund Amendments and Reauthorization Act of 1986, H.R. Rep. No. 99-253, Part 3 at 19 (1985), reprinted in 1986 U.S.C.C.A.N. 3038, 3042).[6]

Judicial review of a settlement negotiated by the United States is subject to special

---

[4] In United States v. A-1 Auto, Civ. Action No. 3:01CV1567, the consent decree was entered on December 17, 2002. In United States v. Franc Motors, 3:02CV0071, the consent decree was entered on September 19, 2002. In this matter, the consent decree with the third party generators was entered on November 15, 2004.

[5] See also Conservation Law Found. of New England, Inc. v. Franklin, 989 F.2d 54, 58 (1st Cir. 1993)(court reviews decree to ensure that it is "fair, adequate, reasonable; that the proposed decree will not violate the Constitution, a statute, or other authority; [and] that it is consistent with the objectives of Congress")(quoting Durrett v. Housing Auth. of Providence, 896 F.2d 600, 604 (1st Cir. 1990)).

[6] See also United States v. DiBiase, 45 F.3d 541, 543 (1st Cir. 1995); United States v. Charles George Trucking, Inc., 34 F.3d 1081, 1084-85 (1st Cir. 1994).

5

deference. According to the First Circuit in <u>Cannons</u>, courts should not engage in "second-guessing the Executive Branch" when evaluating settlement agreements negotiated by the United States. 899 F.2d at 84.[7] This standard applies equally with respect to consent decrees reached under CERCLA. See <u>United States v. Davis</u>, 261 F.3d 1, 21 (1st Cir. 2001)("Considerable deference is involved in the review of CERCLA consent decrees.").[8] And the reviewing court may approve or reject the proposed Consent Decree, but the court does not have the authority to modify the proposed Decree. <u>United States v. Cannons Eng'g Corp.</u>, 720 F. Supp. 1027, 1036 (D. Mass. 1988), <u>aff'd</u>, 899 F.2d 79 (1st Cir. 1990).

B. <u>The Consent Decree Should Be Approved By the Court</u>.

As discussed below, the Consent Decree meets the prescribed standards of fairness, reasonableness, and consistency with CERCLA, and it should be entered by this Court.

1. <u>The Consent Decree is Fair.</u>

The first element courts consider when reviewing a consent decree is whether the settlement is fair. Fairness of a CERCLA settlement involves both procedural fairness and

---

[7] See generally <u>Sam Fox Publ'g Co. v. United States</u>, 366 U.S. 683, 689 (1961)(Absent malfeasance or bad faith, courts are not to "assess the wisdom of the Government's judgment in negotiating and accepting . . . [a] consent decree."); <u>Conservation Law Found.</u>, 989 F.2d at 58 (The "district court must exercise some deference to the agency's determination that settlement is appropriate.")(quoting <u>Federal Trade Comm'n v. Standard Fin. Mgmt. Corp.</u>, 830 F.2d 404, 408 (1st Cir. 1987)).

[8] See also <u>Cannons</u>, 899 F.2d at 84 ("The relevant standard, after all, is not whether the settlement is one which the court itself might have fashioned, or considers as ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives of the governing statute."); <u>United States v. Rohm & Haas Co.</u>, 721 F. Supp. 666, 685 (D.N.J. 1989)("If a settlement were required to meet some judicially imposed platonic ideal, then, of course, the settlement would constitute not a compromise by the parties but judicial fiat. Respect for litigants, especially the United States, requires the court to play a much more constrained role."); <u>Charles George</u>, 34 F.3d at 1085 (Courts "must defer heavily to the parties' agreement and the EPA's expertise.").

6

substantive fairness. <u>Davis</u>, 261 F.3d at 23; <u>Cannons</u>, 720 F.Supp. at 1039.

Courts evaluate procedural fairness by considering the openness and candor of the bargaining process. <u>Davis</u>, 261 F.3d at 23. In <u>Rohm & Haas</u>, the court found that

> where a settlement is the product of informed, arms-length bargaining by the EPA, an agency with the technical expertise and the statutory mandate to enforce the nation's environmental protection laws, in conjunction with the Department of Justice . . . <u>a presumption of validity attaches to that agreement</u>.

721 F. Supp. at 681 (citing <u>City of New York v. Exxon Corp.</u>, 697 F. Supp. 677, 692 (S.D.N.Y. 1988))(emphasis added).[2]

Here, the Consent Decree is procedurally fair. During the course of the settlement process, Plaintiff and Torrington had adverse interests, and were represented by counsel and the process of negotiating the Decree took months, if not years. The complaint in this matter was filed in 2001, and the parties commenced active settlement discussions with the assistance of Magistrate Judge Garfinkel commencing in January 2004. The parties' interests were adverse and only after a period of hard-fought negotiations was a compromise ultimately reached. Accordingly, the process of achieving the settlement satisfies the criterion of procedural fairness.

The second element of the fairness inquiry is substantive fairness. As the First Circuit stated in <u>Cannons</u>: "Substantive fairness introduces into the equation concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible." 899 F.2d at 87. As the court explained: "The logic behind these concepts dictates that settlement terms must be based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if

---

[2] See also <u>DiBiase</u>, 45 F.3d at 544-46; <u>Charles George</u>, 34 F.3d at 1089.

necessarily imprecise) estimates of how much harm each [potentially responsible party] has done." Id.[10] Furthermore, "[a] finding of procedural fairness may also be an acceptable proxy for substantive fairness, when other circumstantial indicia of fairness are present." Davis, 261 F.3d at 23.

For the generator defendants, the United States developed a formula for comparative fault based upon volumetric contribution of waste to the Site. Under previously approved settlements, the United States resolved its claims against each generator based upon 8.5 cents per gallon of waste sent to the Site by that generator.[11] Using this formula, Torrington would be liable for $330,000.

Torrington argued, however, that the formula should not be applied to Torrington because its waste was not present at the Site when EPA emptied the above ground storage tanks. Under United States v. Alcan Aluminum Corp., 990 F.2d. 711 (2nd Cir. 1993) and its progeny, Torrington contends it would prevail at trial in establishing either it caused no harm at the Site, or it caused only a divisible harm for a fraction of the United States' costs. Id. Based upon this divisibility defense, potential litigation risk, and expense, the United States offered to settle with Torrington for less than $330,000, before the United States filed its complaint. The United States also conveyed that the discounted offer would expire with the filing of the complaint. Because the parties were unable to reach agreement during the earlier stages of negotiation, the Unites States filed a complaint against Torrington. After further litigation and negotiation, Torrington agreed to resolve its liability for $350,000, which represents its volumetric share, plus

---

[10] See also Charles George, 34 F.3d at 1087-89.

[11] See footnote 4 above.

8

a premium for the litigation expenses incurred by the United States. Under the circumstances, the compromise reflects a fair settlement.

No other single defendant has paid more to resolve its liability at the Site than Torrington. However, Mr. Bello suggests in his letters that the United States should recover more from Torrington. Yet, Mr. Bello ignores or apparently fails to consider the potential divisibility defenses asserted by Torrington; fails to acknowledge that he himself owned and/or operated the Site during the years it was used to store hazardous waste; and omits to recognize that he benefitted as the landowner from the clean-up undertaken at the Site. His settlement of $150,000 is less than half of what Torrington will pay. In short, Torrington's payment is fair when compared to the payments of other generators and the past owners/operators of the Site. Further, while the United States believes it would ultimately prevail at trial, the $350,000 settlement offer on behalf of Torrington represents a fair compromise of what might have been a complicated and lengthy trial.

2. The Settlement Is Reasonable.

Three factors are significant to the determination that a CERCLA settlement is reasonable: "the effectiveness of the decree as a vehicle for cleaning the environment; providing satisfactory public compensation for actual (and anticipated) costs of remediation; and accounting for the relative strength of the parties' litigating positions and foreseeable risks of loss." Davis, 261 F.3d at 26.[12]

The first factor is not applicable here because EPA performed the clean-up on its own initiative before negotiations began with the responsible parties to resolve their liability for the

---

[12] See also Cannons, 899 F.2d at 89-90.

contamination. Accordingly, only the second two criteria are relevant to the inquiry of whether the Consent Decree is reasonable in this case.

The second factor used to evaluate the reasonableness of a consent decree – whether the public is adequately compensated – is easily satisfied by the Settlement. EPA's total removal costs related to the Site were approximately $1.77 million, not including interest. Under CERCLA, a defendant is potentially jointly and severally liable for the entire amount. However, it is well-settled that "[d]iscounts on maximum potential liability as an incentive to settle are considered fair and reasonable under Congress' [CERCLA] statutory scheme." Davis, 261 F.3d at 26. Upon entry of the Consent Decree, Torrington will pay $350,000 in CERCLA removal costs. Recovery of this amount combined with the additional sums of about $1.285 million collected under additional settlement agreements means that EPA will be reimbursed for approximately 92% of its removal costs.[13] Therefore, the United States submits that the Settlement is reasonable because it adequately compensates the public for the clean-up of the Site.

The final factor is an evaluation of the relative strength of the parties' litigating positions. See Davis, 261 F.3d at 26 ("It is appropriate 'to factor into the equation any reasonable discounts for litigation risks, time savings, and the like that may be justified.'") (quoting Charles George, 34 F.3d at 1087).[14] A review of this element reinforces the reasonableness of the Decree. If

---

[13] See footnote one above.

[14] See also In re Acushnet River & New Bedford Harbor, 712 F. Supp. 1019, 1036 (D. Mass. 1989) ("An interpretation of [CERCLA] more in keeping with the intent of, as well as the language employed by, Congress is one that requires the United States to assess the strengths and weaknesses of its case and drive the hardest bargain that it can.").

10

forced to litigate the liability issues resolved in the Decree, the United States believes it would prevail. Nonetheless, prosecuting an action against Torrington certainly would have delayed the recovery of EPA's removal costs and would have forced the Government to incur significant enforcement costs in the process. When compared to the relatively low cost of the clean-up, such time and expense is justifiably avoided.

Accordingly, the proposed Consent Decree is clearly reasonable. The comprehensive and expeditious recovery of costs adequately compensates the public, and the Settlement reflects the relative strengths of the parties' litigation positions.

3. The Settlement Is Consistent With CERCLA's Goals And In The Public Interest.

The final criterion for entering the proposed settlement, consistency with CERCLA's goals and the public interest, is easily met. The overarching goals of CERCLA include accountability, desirability of an unsullied environment, and prompt response activities. See Davis, 261 F.3d at 26 ("The purposes of CERCLA include expeditious remediation at waste sites, adequate compensation to the public fund and the imposition of accountability.")[15] Other important purposes of CERCLA are to promote finality and reduce transaction costs. See 42 U.S.C. § 9622(a).[16] Here, the Decree enables expeditious and substantial recovery of the costs EPA incurred in abating the threat to human health and the environment created by the hazardous substances stored, and disposed of, at the Site. By resolving the claims against Torrington, the United States utilized a rational, cost-effective means of recouping the costs of the clean-up

---

[15] See also Charles George, 34 F. 3d at 1086.

[16] See also Cannons, 899 F.2d at 90; United States v. Hooker Chem., 540 F. Supp. 1067, 1072 (W.D.N.Y. 1982), aff'd, 749 F.2d 968 (2d Cir. 1984); Rohm & Haas, 721 F. Supp. at 696.

11

while holding Torrington accountable for the clean-up of waste sent to the Site.

Furthermore, there is a "clear policy in favor of encouraging settlements . . . particularly in an area where voluntary compliance by the parties . . . will contribute significantly toward ultimate achievement of statutory goals." Patterson v. Newspaper & Mail Deliverers' Union, 514 F.2d 767, 771 (2d Cir. 1975).[17] This public policy favoring the resolution of litigation by settlement is particularly strong in the enforcement of environmental statutes. Thus, the policy favoring settlement "is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of [EPA]." Cannons, 720 F. Supp. at 1035.[18]

In addition, the settlement of environmental cases is in the public interest because it effectuates basic policy goals of the statutes. As stated above, in this case the Government will obtain prompt reimbursement of clean-up costs associated with the Site while being spared significant litigation and enforcement costs. Meanwhile, Torrington – which contributed waste oil to the Site – is held accountable under the Decree. Therefore, the final criterion to support entry of the Decree is satisfied.

## IV. CONCLUSION

The Consent Decree executed by the United States and Torrington is a fair and reasonable resolution of claims against Torrington, comports with the objectives of CERCLA, and is in the

---

[17] See also City of New York v. Exxon Corp., 697 F. Supp. 677, 692 (S.D.N.Y. 1988).

[18] See also United States v. Vertac Chem. Corp., 756 F. Supp. 1215, 1218 (E.D. Ark. 1991), aff'd, sub nom. United States v. Hercules, Inc., 961 F.2d 796 (8th Cir. 1992) (court entered CERCLA/RCRA settlement quoting Cannons); United States v. Bliss, 133 F.R.D. 559, 567-68 (E.D. Mo. 1990) (court recognized public policy favoring settlements under CERCLA); Citizens for a Better Env't v. Gorsuch, 718 F.2d 1117, 1126 (D.C. Cir. 1983) (environmental settlement that saved time and money was highly favored).

public interest. There has been no showing that entry of the Decree is improper, inadequate or not in the public interest. The Court should defer to the agreements reached in the Decree, and enter the Decree as a final judgment pursuant to Federal Rule of Civil Procedure 58.

        Respectfully Submitted,

        KELLY A. JOHNSON
        Acting Assistant Attorney General
        Environment and Natural Resources Division

        /s/ C. A. Fiske
        CATHERINE ADAMS FISKE
        Environmental Enforcement Section
        Environment and Natural Resources Division
        U.S. Department of Justice
        One Gateway Center -- Suite 616
        Newton, MA 02458
        (617) 450-0444 (phone)
        (617) 450-0448 (fax)

        KEVIN J. O'CONNOR
        United States Attorney
        District of Connecticut

        JOHN B. HUGHES
        Assistant United States Attorney
        U.S. Attorney's Office
        District of Connecticut
        Connecticut Financial Center
        157 Church Street
        New Haven, Connecticut 06510

OF COUNSEL:

STEVEN SCHLANG
Senior Enforcement Counsel
U.S. Environmental Protection Agency
Region I
One Congress Street, Suite 1100
Boston, MA  02114-2023

## Certificate of Service

I hereby certify that the foregoing document was served this 2nd day of May, 2005, by first class mail upon counsel of record in this matter and upon Ralph and Vera Bello.

/s/ C. A. Fiske
Catherine Adams Fiske